[Civ. No. 29713. Second Dist., Div. Two. July 15, 1966.]

Estate of EDWARD H. McLAUGHLIN, Deceased. FIRST WESTERN BANK AND TRUST COMPANY, as Executor, etc., Petitioner and Appellant, v. EVA MAE DUIT, Objector and Respondent.

Vaughan, Brandlin, Robinson & Roemer and Walter R. Trinkaus for Petitioner and Appellant.

O'Melveny & Myers, Sidney H. Wall, E. Harley Walther, and T. E. Calleton for Objector and Respondent.

ROTH, P. J. — Testator Edward McLaughlin died on December 19, 1962. His gross estate for federal estate tax purposes was $2,575,744.43.

Testator, in his will, directed: "Third: I give, devise and bequeath the sum of $40,000.00 cash lawful money of the United States, but not in excess of five (5%) per cent of the distributable assets of my estate, to MRS. LOUIS E. DUIT. . . ." First Western Bank and Trust Company is the executor and appellant. Eva Mae Duit (Mrs. Louis E.) is respondent.

Respondent is also the beneficiary of a $20,000 insurance policy on the testator's life.

Clause FIFTH gives the residue of his estate to his five children.

By codicil, there was a gift of $10,000 to one Gladys Harnden in language similar to that of paragraph THIRD, limiting the bequest to 2½ percent of the distributable estate.

In its fourth and final accounting, executor interpreted the

language of paragraph THIRD to require a proration of federal estate taxes and charged respondent with California inheritance taxes. Respondent objected to this interpretation in its application to paragraph THIRD. She conceded the validity of the tax burden on the insurance proceeds.

The trial court held that the language of the will was clear and unambiguous and directed a tax-free bequest. Extrinsic evidence was offered to explain a claimed latent ambiguity. An objection thereto was sustained.

■ It is axiomatic, of course, that in construing a will, the intention of the testator is controlling (Prob. Code, § 101; *Estate of Salmonski,* 38 Cal.2d 199, 209 [238 P.2d 966].)

■ But the intention of the testator is that expressed by the language of the will. (*Estate of Beldon,* 11 Cal.2d 108, 112 [77 P.2d 1052]; *Estate of Wilson,* 184 Cal. 63, 66-67 [193 P. 581].) Where the language is clear and unambiguous, extrinsic evidence may not be admitted to explain that language. (*Estate of Carter,* 47 Cal.2d 200, 206, 209 [302 P.2d 301].)

■ The trial court did not err in refusing to admit the proffered evidence.

Probate Code, section 970 provides for proration of federal estate taxes among the beneficiaries of an estate ''except in a case where a testator otherwise directs in his will. . . .'' The section expresses a general public policy of the state in favor of proration (*Estate of Cushing,* 113 Cal.App.2d 319, 333 [248 P.2d 482].) It has been said, therefore, that only a clear and unambiguous direction of the testator will free a beneficiary from his share of the tax burden. (*Estate of Armstrong,* 56 Cal.2d 796, 802 [17 Cal.Rptr. 138, 366 P.2d 490].)

The question at bench is whether the grant of paragraph THIRD above quoted is a clear and unambiguous expression of intent by the testator. The trial court concluded that it was, and we agree.

Respondent received a bequest of $40,000 or 5 percent of the ''distributable estate,'' whichever is less. Both parties agree that the words ''distributable estate'' refer to the amount remaining in the estate after payment of debts and expenses, including federal estate taxes. (*Estate of Bauer,* 59 Cal. App.2d 152, 158, 159 [138 P.2d 717]; see *In re Meynen's Estate,* 173 Misc. 19 [18 N.Y.S.2d 62, 64].) Thus, in *Bauer,* the court referring to an opinion by Chief Justice Taft, says at page 159:

''In 28 American Jurisprudence 8, section 3, it was stated in referring to the federal estate tax: 'It is not a tax on what

comes to the beneficiaries or heirs, but upon what is left by the decedent. It is treated as an expense of administration, as a proper disbursement by an executor. . . . The tax comes into existence before and is independent of the receipt of the property by the legatee or distributee.' The case of *Hepburn* v. *Winthrop, supra,* 83 F.2d 566 [65 App. D.C. 309, 105 A.L.R. 310], stated at page 572 in referring to the provision of the Internal Revenue Code that the estate tax was to be paid before distribution: 'This implies that the tax is of the nature of an administrative expense. . . . It is therefore not a payment as to which the beneficiaries have any concern. It is not a charge against either legatees or distributees.' ''

It seems clear to us that had paragraph THIRD in its entirety read ''I give . . . $40,000 . . . of the distributable assets of my estate. . . .'' that such a direction would be clear and certain. It seems equally clear that the respondent would have received her bequest free from estate tax liability if no amount had been mentioned, and if the directions were to give respondent 5 percent of the distributable assets of the estate.[1]

This interpretation is fortified by the decision of this court in *Estate of Anthony,* 230 Cal.App.2d 766 [41 Cal.Rptr. 317]. In that case, the specific bequest read: ''. . . I further direct that the legacies in [the legatee's] favor created by my said Will . . . are hereby to be increased so that the total amount to be received by her from my estate . . . shall aggregate the sum of one hundred thousand dollars . . . provided, however, that the total amount so to be received by her shall not exceed twenty per cent (20%) of the total net value of my estate available for distribution after payment of federal estate taxes

---

[1]In a sense, of course, respondent would be sharing the tax burden by taking only a percentage of an amount already reduced by payment of taxes. This, however, is not proration under Probate Code, section 970. Proration depletes the amount actually determined to be received by the legatee or devisee. It can be said that in this sense, appellant's interpretation of the bequest at bench requires double payment of taxes by respondent. The same argument does not apply to the $40,000 bequest read alone. However, any other construction of the language used by the testator leads to a strained result.

If the $40,000 bequest of ''distributable assets'' were to be read separately, and we assume a net distributable estate of $799,999.99, on appellant's theory respondent would receive $39,999.99 free of further apportionment under the 5 percent limitation in the bequest. By adding two cents to the net or distributable estate, which would become $800,000.01, the respondent would receive $40,000, *subject to proration.* The proration, of course, would reduce the bequest considerably below $40,000. The hypothesis indicates that the $800,000.00 threshold is determined after the taxes *are paid* by the estate, and whether respondent receives 5 percent or $40,000, she receives that amount free of estate tax liability.

upon or from my estate.'' (*Id.* at p. 769.) The amount of the estate was such that the legatee was to take under the 20 percent limitation clause. In determining whether proration should have been made, the court said, at p. 773: ''Here, the testator directed that the federal taxes be paid 'from my estate' *before* computing whether the intended $100,000 bequest would *exceed 20 per cent of the total net value of the estate,* in which event the bequest would be reduced to the 20 per cent figure. However, in its computation, the trial court charged her with her pro rata share of such taxes. This we deem to have been error. The bequest to appellant is to be free of federal taxes.''

█ The proration statute was designed to prevent the consumption of the residue by taxes where the testator made specific bequests to others. The inequity of such an event is obvious where, as here, the specific legatee or devisee is a stranger and the residue, as is most common, goes to the widow and children (see *Work of the 1963 Legislature,* 17 So.Cal.L.Rev. 1, 31; cf. *Wells Fargo Bank & Union Trust Co.* v. *Older,* 50 Cal.App.2d 724 [123 P.2d 873].) In the case at bench, however, the testator has provided for protection of the residuary legatees by ensuring that in no event could they receive less than 92½ percent[2] of the estate after debts, expenses and taxes.

We conclude, therefore, that the language of the bequest in question is clear and not in conflict with the public policy of this state.

█ The California inheritance tax, however, is not imposed on the estate; it is imposed on the transfer to the legatee (Rev. & Tax. Code, §§ 13401, 13601). █ Although, as an administrative matter, the personal representative pays the tax in the first instance, the transferee is ultimately liable for the tax out of the property transferred. (Rev. & Tax. Code, §§ 14101, 14121; *Cohn* v. *Cohn,* 20 Cal.2d 65 [123 P.2d 833].)

In *Cohn,* at pages 67, 68, the court says:

''Generally speaking, the state assesses the privilege of succeeding to property, and computes the tax upon the interests of the legatees or devisees and the degree of relationship, if any, to the decedent. (*Estate of Wilmerding,* 117 Cal. 281 [49 P. 181]; *Estate of Miller,* 184 Cal. 674 [195 P. 413, 16 A.L.R. 694]; *Estate of Watkinson,* 191 Cal. 591 [217 P. 1073];

---

[2] The limitations on the bequest to respondent and Gladys Harnden are 5 percent and 2½ percent of the distributable estate respectively.

*Estate of Bloom,* 213 Cal. 575 [2 P.2d 753] ; *Estate of Rath,* 10 Cal.2d 399 [75 P.2d 509, 115 A.L.R. 836].) The tax is not one of the expenses of administration or a charge upon the general estate of the decedent; it is collectible out of each specific share or interest to which the beneficiary succeeds, and not from the general property of the estate. (*Estate of Wilmerding, supra; Estate of Kennedy,* 157 Cal. 517 [108 P. 280, 29 L.R.A. N.S. 428]; *Estate of Chesney,* 1 Cal.App. 30 [81 P. 679] [citation].) Under the Inheritance Tax Act of 1921 (Stats. 1921, p. 1503, § 3; Deering's Gen. Laws, 1923, Act 8443), which was in effect at the date of Charles Cohn's death, the inheritance tax constitutes a lien upon the property passed or transferred, and executors and administrators are liable for it. By section 9 of the act, any executor or administrator having in charge any legacy or property for distribution, is directed to deduct the tax therefrom, or, if the property be not money, he is directed to collect the tax thereon from the legatee. Under these sections, therefore, the personal representative of the estate is primarily liable for the payment of the tax and it is chargeable against the money and other property of the estate in his hands. However, the fact that the executor or administrator must pay the tax and is authorized to deduct the amount assessed against the distributive share of each person inheriting or succeeding to the estate does not change the nature of the tax as one upon the right to inherit. The provisions concerning collection of the tax are administrative in character; they do not fix the liability for it upon the estate. (*Hostetter* v. *United States,* 113 F.2d 64.) ''

A testator may by specific language direct a bequest to be paid to the beneficiary free of inheritance tax. (*Estate of Nesbitt,* 158 Cal.App.2d 630, 632 [323 P.2d 474]; *Estate of Anthony,* 230 Cal.App.2d 766, 774 [41 Cal.Rptr. 317].) In such case, the tax is borne by the estate rather than the legatee. The narrow question at bench on this facet of paragraph Third is whether the testator had such an intention.

The testator does not say specifically in paragraph Third, as is true in *Nesbitt, supra,* that the bequest must be free of *inheritance* tax. Since the inheritance tax is a tax on the transfer, it is logical to assume that the testator intended the legatee to pay the tax. Otherwise the legacy would necessarily have to be in an amount more than $40,000, to wit: a sum in addition, sufficient to pay the inheritance tax on $40,000, or on the 5 percent, if it were less than $40,000. This means that inheritance tax on the increased legacy would also

be greater than the tax on the original $40,000, and so on, until the legatee received an amount which would net her $40,000 or 5 percent of the distributable estate. There is also a question as to the exact amount of the distributable estate. Thus, if the distributable estate were exactly $800,000, 5 percent would give to the legatee $40,000. However, if the distributable estate were required to pay the inheritance tax on the $40,000, there would no longer be a distributable estate of $800,000. We do not assert that this reasoning is conclusive, but in the absence of an expressed intention of the testator, the difference between the nature of an estate tax and an inheritance tax (*Estate of Bauer; Cohn* v. *Cohn, supra*), and no specific authority to the contrary, it does appear to us to be sound and equitable.

The order is affirmed with respect to the federal estate taxes and reversed with respect to the state inheritance taxes, with directions to the court to make the proper adjustments.

Herndon, J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 7, 1966.

[Crim. No. 2416. Fourth Dist., Div. One. July 19, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ALEX DOMIN-GUEZ RODRIGUEZ, Defendant and Appellant.

Alex Dominguez Rodriguez, in pro. per., and William M. Apgar, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Charles R. Kocher, Deputy Attorney General, for Plaintiff and Respondent.

COUGHLIN, J.—Appellant was charged with selling heroin and with the conviction of a prior narcotics offense; pleaded not guilty to the charge of selling; and denied the prior conviction. His wife, as a codefendant, was charged with another and separate sale of narcotics. Both defendants were found guilty of the offenses charged and the allegations charging defendant with a prior conviction were found to be true. Judgment imposing a prison sentence upon appellant was entered accordingly.

The offense of which appellant was found guilty involved a sale of heroin, on May 14, 1965, to an informer in the presence of an undercover agent. Appellant testified at the trial; admitted the sale; but asserted the defense of entrapment.

On July 2, 1963, appellant had pleaded guilty to the offense of possession of heroin. Thereafter, pursuant to the provisions of Penal Code section 6451, which now are in Welfare and Institutions Code section 3051, imposition of sentence was suspended and proceedings instituted under that section culminated in appellant's commitment for treatment as a narcotics addict. At the time of the subject offenses appellant was on parole under the latter commitment.

The contentions on appeal are: (1) The court erred in failing to instruct the jury that evidence of a subsequent offense of possession of heroin should not be considered on the issue of entrapment; (2) also erred in sustaining objections to testimony by appellant relating the contents of conversations between him and the informer; and (3) instructed the jury erroneously on the prior conviction issue.

Appellant and his wife were arrested at their home, pursuant to a warrant, on July 22, 1965. As an incident to that arrest, the officers searched the premises and found 19 bindles of heroin, and injection paraphernalia, apparently hidden in a trash container in the kitchen. This heroin and

paraphernalia, and testimony respecting its discovery, over objection, were admitted in evidence as a part of the People's case in chief. At that time the court instructed the jury this testimony was admitted for a limited purpose, specifying such, and should not be considered for any other purpose. Similar instructions were given at the time the court instructed the jury generally. Appellant contends the court erred in failing to include within these instructions an admonition that the evidence in question, which tended to prove the commission of a separate and subsequent offense, should not be considered on the issue of entrapment. At no time did appellant request such an addition to the instructions given. The evidence in question was offered as a part of the People's case in chief; tended to prove issues material to that case; and properly was admitted even though it established the commission of a separate and subsequent offense. (*People* v. *Smith,* 235 Cal.App.2d 462 [45 Cal.Rptr. 310] ; *People* v. *Marshall,* 226 Cal.App.2d 243, 245 [37 Cal.Rptr. 887] ; see also *People* v. *Sanders,* 163 Cal.App.2d 132, 134 [328 P.2d 825] ; *People* v. *Bean,* 149 Cal.App.2d 299, 301 [308 P.2d 27] ; *People* v. *Freytas,* 157 Cal.App.2d 706, 718-719 [321 P.2d 782].) █ It was not offered on the issue of entrapment in proof of facts proscribed by the rule stated in *People* v. *Benford,* 53 Cal.2d 1, 11 [345 P.2d 928], and the instructions given by the court did not permit its use for this purpose. Absent a request for an appropriate instruction respecting the relationship between the evidence in question and the issue of entrapment, the failure to specifically instruct as to the limitation on its use in this regard was not error.

In the course of appellant's testimony, on several occasions, he commenced to relate the contents of conversations between the informer and himself, and was interrupted by the district attorney's objection that such testimony was hearsay, which was sustained. No question was asked appellant soliciting the contents of any conversations between himself and the informer. The rulings sustaining objections were accepted without argument. The court was not advised of the purpose for which such conversations were volunteered, nor was an offer of proof made respecting their contents. On one occasion counsel for appellant, without permitting an objection to be completed, told appellant not to give the contents of the conversation. On appeal appellant contends the conversations between himself and the informer were material to the issue of entrapment. █ Statements of an informer to a defendant which are part of a transaction resulting in the sale of

narcotics may be material to the issue of intent as an element of the defense of entrapment. The contents of such statements are admissible to prove what was said rather than the truth of what was said and, for this reason, testimony relating such is direct and not hearsay. (*People* v. *Contreras,* 201 Cal.App.2d 854, 857 [20 Cal.Rptr. 551].) Appellant assumes the contents of the conversations about which he intended to testify were relevant to the issue of intent included in the defense of entrapment. ▊ However, the lack of any assertion of the purpose for introducing such testimony, or of any offer of proof respecting the contents of the conversations in question, forecloses a determination of the questions of materiality or relevancy. In *People* v. *Holland,* 204 Cal.App.2d 77, 81 [23 Cal.Rptr. 84], the court said: ''Where a question to which an objection is sustained does not of itself indicate that the answer will be favorable to the party seeking to introduce the testimony, before the ruling will be reviewed on appeal, an offer of what is proposed to be proven first must be made to the trial court so that the reviewing court may determine whether such evidence would have been material and beneficial to the party offering it. [Citations.] This general rule is particularly applicable where the question appears to call for hearsay testimony.'' (In accord: *People* v. *Rosson,* 202 Cal. App.2d 480, 489 [20 Cal.Rptr. 833]; *People* v. *Bryant,* 157 Cal.App.2d 528, 533 [321 P.2d 45]; *People* v. *Ratten,* 39 Cal. App.2d 267, 270 [102 P.2d 1097].) ▊ Furthermore, assuming error in the rejection of the conversations in question, absent a showing of the contents thereof any prejudice from the exclusion cannot be determined. On appeal the duty devolves upon appellant not only to specify the error of which he complains, but also to establish its prejudicial nature, i.e., that it resulted in a miscarriage of justice. (*People* v. *Britton,* 6 Cal.2d 10, 13 [56 P.2d 491]; *People* v. *Marshall,* 209 Cal. 540, 550 [289 P. 629]; *People* v. *Massey,* 151 Cal.App.2d 623, 649 [312 P.2d 365].)

▊ Appellant's contention that instructions on the prior conviction issue were error also is without merit. There was no question of fact on this issue for submission to the jury. The evidence is without dispute, and conforms to appellant's testimony in the premises, that he pleaded guilty to the offense of possession of heroin in 1963 and, as a result thereof, was committed for treatment as a narcotics addict. The issue on appeal is whether this plea of guilty constituted a conviction within the meaning of Health and Safety Code section 11501, which

imposes a longer term of imprisonment for the offense of selling heroin where the offender "has been previously convicted" of a narcotics offense. ▮ "A plea of guilty constitutes a conviction." (*Stephens* v. *Toomey,* 51 Cal.2d 864, 869 [338 P.2d 182]; *People* v. *Banks,* 53 Cal.2d 370, 390 [1 Cal.Rptr. 669, 348 P.2d 102].) ▮ The fact that upon conviction further proceedings are suspended and a defendant is committed as a narcotics addict under the provisions of former Penal Code section 6451 (Welf. & Inst. Code, § 3051), does not foreclose the effect of the conviction in determining the extent of punishment for a second offense. The intent of the statute in this regard is clear as demonstrated by Welfare and Institutions Code section 3200, which provides that upon the successful completion of a narcotics addiction commitment, the court shall discharge the person committed from the program and "may dismiss the criminal charges of which such person was convicted," but "the conviction is a prior conviction for purposes of Division 10 of the Health and Safety Code," which includes section 11501 increasing the punishment for the offense of selling heroin where the offender "has been previously convicted" of a narcotics offense. It would be absurd to construe the applicable statutes as providing that a conviction resulting in a narcotics addiction commitment is a "prior conviction" under Health and Safety Code section 11501 where the person committed is discharged from the program and the criminal proceeding resulting in the conviction is dismissed, but is not such a conviction where there is no discharge or dismissal. A construction of a statute that leads to an absurdity should be rejected. (*Warner* v. *Kenny,* 27 Cal.2d 627, 629 [165 P.2d 889]; *People* v. *Kuhn,* 216 Cal.App. 2d 695, 698 [31 Cal.Rptr. 253].) It has been held a conviction is such for prior conviction purposes, even though imposition of judgment thereon is suspended and the defendant is placed on probation. (*People* v. *Christman,* 41 Cal.App.2d 158, 160 [106 P.2d 32]; *People* v. *Rosencrantz,* 95 Cal.App. 92, 94 [272 P. 786]; gen. see *People* v. *Banks,* 53 Cal.2d 370, 386-387 [1 Cal.Rptr. 669, 348 P.2d 102]); and also is a conviction for impeachment purposes even though criminal proceedings are suspended, judgment is not pronounced, and the defendant is committed to the Youth Authority. (*People* v. *Williams,* 27 Cal.2d 220, 229 [163 P.2d 692].) The decisions in these analogous situations support the conclusion that a conviction of a narcotics offense is such for prior conviction purposes under Health and Safety Code section 11501, even though criminal

proceedings following conviction are suspended pursuant to former Penal Code section 6451.

The judgment is affirmed.

Brown, P. J., and Whelan, J., concurred.

A petition for a rehearing was denied August 8, 1966, and appellant's petition for a hearing by the Supreme Court was denied September 14, 1966.

[Crim. No. 2376. Fourth Dist., Div. Two. July 19, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. LEROY EDWARD PEREZ, Defendant and Appellant.

Hennigan, Ryneal & Butterwick and Charles J. Hunt, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert H. Francis, Deputy Attorney General, for Plaintiff and Respondent.

TAMURA, J.—Following a jury trial on an information charging him with a violation of section 11530 of the Health

and Safety Code (possession of marijuana) and one prior felony conviction for the sale of heroin (admitted prior to trial), defendant was found guilty, denied probation and sentenced to the state prison for the term prescribed by law. He now appeals from the judgment of conviction.

On November 10, 1964, about 6 or 6:30 p.m., Detectives Willis and Richenberger of the San Bernardino County sheriff's office were proceeding southerly on Riverside Drive in Rialto in an unmarked sheriff's vehicle with Detective Willis driving. It was dark and had been raining intermittently. The officers intended to turn east on Slover Street to continue a surveillance of a suspected narcotics peddler's house which was located less than a quarter of a mile from the intersection of Slover and Riverside Drive. As they neared the intersection they saw a vehicle turn onto Riverside Drive in front of them. Upon noting that the vehicle was one defendant had previously been seen driving and believing that the suspected narcotics peddler might also be in the vehicle, Willis pulled closer whereupon he recognized defendant at the wheel. There was no other occupant. Willis knew the defendant from a previous encounter in connection with his arrest and conviction on a charge of selling heroin and knew that defendant had been committed to the California Rehabilitation Center, returned to court, placed on probation, and was still on probation. Shortly prior to this incident, the probation officer had asked Willis if he had any information concerning the defendant's activities. Willis had therefore intended to look the defendant up to make such inquiries.[1] Upon recognizing defendant and noting that he came from the direction of the home of the suspected narcotics peddler, the detectives decided to question him concerning his activities and seek any information he might have concerning the suspected peddler. When the detective turned on the red light and siren, defendant abruptly stopped his vehicle on the right shoulder. Detective Willis stopped immediately to the rear. As Richenberger stepped out of the sheriff's vehicle and approached defendant's car from the right, defendant looked back through the window, saw Richenberger, bolted from the driver's side of the vehicle and ran towards the center of the highway. As he ran, he reached into his jacket and threw a small white

---

[1]Detective Willis testified that he had information that the defendant was again using narcotics, associating with users and buying narcotics from the suspected peddler. This testimony, however, was stricken when the prosecution refused to reveal the identity of the informant.

package across the street. Detective Willis drew his gun, pursued defendant and apprehended him while Detective Richenberger retrieved the white package. When the three returned to the sheriff's vehicle the officers opened the package and Detective Willis determined that it contained marijuana. Defendant was thereupon taken into custody.

Defendant contends that the white package and evidence as to its content should have been excluded on the ground that it was illegally obtained as a direct result of unlawful conduct of the officers in stopping defendant without probable cause.

 An officer may stop a pedestrian or motorist for questioning under circumstances short of probable cause for arrest. (*People* v. *Mickelson*, 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) There must, however, be some suspicious circumstance to justify even such a limited interference with an individual's freedom of movement. (*People* v. *One 1960 Cadillac Coupe*, 62 Cal.2d 92 [41 Cal.Rptr. 290, 396 P.2d 706]; *Hood* v. *Superior Court*, 220 Cal.App.2d 242 [33 Cal.Rptr. 782].) There is no precise formula by which it can be determined whether an officer acted lawfully in stopping a pedestrian or a motorist for questioning; the test is ". . . when the circumstances are such as would indicate to a reasonable man in a like position that such a course is necessary in the proper discharge of his duties." (*People* v. *One 1960 Cadillac Coupe, supra,* pp. 95-96; *People* v. *Davis,* 222 Cal.App.2d 75, 78 [34 Cal.Rptr. 796]; *People* v. *Porter,* 196 Cal.App.2d 684, 686 [16 Cal.Rptr. 886].) The reasonableness of an officer's action depends upon the facts and circumstances of the particular case. (*People* v. *Alcala,* 204 Cal.App. 2d 15, 20 [22 Cal.Rptr. 31]; cf. *People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Schader,* 62 Cal.2d 716, 726 [44 Cal.Rptr. 193, 401 P.2d 665].) A mere hunch, without more, that a person may be involved in criminal activity is, of course, insufficient. (*People* v. *One 1960 Cadillac Coupe, supra.*)

 In the circumstances here presented, it is our opinion that the officers were justified in stopping defendant for routine questioning and investigation. There is no suggestion that the officers intended to arrest defendant or conduct a search of his person or vehicle. Officer Willis' knowledge of defendant's background involving narcotics, his prior conviction for the sale of heroin, and his probationary status are significant factors in determining whether the officers acted reasonably. (*People* v. *Currier,* 232 Cal.App.2d 103, 106-107

[42 Cal.Rptr. 562]; *People* v. *Brooks,* 234 Cal.App.2d 662 [44 Cal.Rptr. 661]; *People* v. *Alcala, supra,* 204 Cal.App.2d 15; *People* v. *McMurray,* 171 Cal.2d 178 [340 P.2d 335]; *People* v. *Poole,* 174 Cal.App.2d 57 [344 P.2d 30].) Although the terms and conditions of the probation order are not disclosed by the record, it is an implicit condition of every such order that the probationer refrain from engaging in any criminal activity or becoming "abandoned to improper associates or a vicious life". (Pen. Code, § 1203.2; *People* v. *Cortez,* 199 Cal. App.2d 839, 844 [19 Cal.Rptr. 50].) The activities of a probationer are thus subject to more careful official scrutiny than those of other citizens. When the facts in the knowledge of the officers are coupled with their observation of defendant leaving an area in which a suspected narcotics peddler's home was located—a home which it was their mission to maintain under surveillance—it cannot be said that they acted unreasonably in stopping defendant for questioning. Clearly the officers were not acting on mere whim or caprice; there was a reasonable basis for the exercise of their judgment.

The white package and contents were, therefore, properly received in evidence. If in response to a reasonable official inquiry, a suspect voluntarily reveals incriminating evidence, he may not later complain that he acted on an implied threat of unlawful conduct of the officers. (*People* v. *Williams,* 220 Cal.App.2d 108, 112 [33 Cal.Rptr. 765]; *People* v. *Michael,* 45 Cal.2d 751 [290 P.2d 852]; *People* v. *Cowman,* 223 Cal.App.2d 109 [35 Cal.Rptr. 528]; *People* v. *Currier, supra,* 232 Cal.App.2d 103, 106; *People* v. *Walker,* 203 Cal. App.2d 552 [21 Cal.Rptr. 692]; *People* v. *Robles,* 183 Cal.App. 2d 212 [6 Cal.Rptr. 748]; *People* v. *Piedra,* 183 Cal.App.2d 760 [7 Cal.Rptr. 152]; *People* v. *Tabb,* 228 Cal.App.2d 750 [39 Cal.Rptr. 675].) Picking up what is in plain view and voluntarily discarded by defendant is not a search. (*People* v. *Williams, supra,* at p. 114; *People* v. *Quinn,* 194 Cal.App.2d 172 [14 Cal.Rptr. 814]; *People* v. *Tabb, supra.*)

*Badillo* v. *Superior Court,* 46 Cal.2d 269 [294 P.2d 23] and *Gascon* v. *Superior Court,* 169 Cal.App.2d 356 [337 P.2d 201], are clearly distinguishable. *Badillo, supra,* involved an illegal entry into a home. In *Gascon, supra,* as the defendant was walking to his car from a liquor store, officers stopped and questioned him and upon their threat to search him, he fled and tossed away incriminating evidence. In this case there was no threat to search. *Hood* v. *Superior Court, supra,* 220 Cal.

App.2d 242, is also distinguishable in that it does not appear that the officers knew the identity of the individuals who entered the vehicle which was later followed, stopped and searched by the officers.

Appellant complains that the white package was received in evidence without proper foundation because its content was not identified in open court prior to its introduction. He therefore complains that it was prejudicial error to refer to the package as one containing marijuana. The error, if any, was clearly nonprejudicial. The package was properly identified as the one picked up by Detective Richenberger and delivered sealed to the crime laboratory chemist, a qualified expert in the identification of narcotics, who testified that the package contained marijuana. (*People* v. *Marich,* 201 Cal. App.2d 462, 465 [19 Cal.Rptr. 909].) The introduction of the package itself was neither essential to establish defendant's guilt nor necessary to assure a fair trial. (*People* v. *Cisneras,* 214 Cal.App.2d 62 [29 Cal.Rptr. 146] ; *People* v. *Munoz,* 198 Cal.App.2d 649 [18 Cal.Rptr. 82] ; *People* v. *Marich, supra.*)

Defendant contends that the superior court had no jurisdiction because he was committed by the magistrate without probable cause. Since no transcript of the preliminary examination has been made a part of the record on appeal, the question as to whether the evidence at the preliminary examination disclosed facts sufficient to constitute probable cause is not reviewable on this appeal from a judgment of conviction. (*People* v. *Jones,* 228 Cal.App.2d 74, 90 [39 Cal.Rptr. 302] ; *People* v. *Scott,* 24 Cal.2d 774, 776-777 [151 P.2d 517].) Defendant relies upon his summary of the testimony given at the preliminary examination as recounted in his affidavit in support of a motion under section 995 of the Penal Code. Even assuming the affidavit to be a fair summary of the testimony given at the preliminary examination, there was clearly probable cause for binding the defendant over to the superior court.

Judgment affirmed.

McCabe, P. J., and Kerrigan, J., concurred.

A petition for a hearing by the Supreme Court was denied August 8, 1966.

[Civ. No. 23549. First Dist., Div. One. July 20, 1966.]

COUNTY OF ALAMEDA, Plaintiff and Appellant, v. JOHN ESPINOZA, SR., Defendant and Respondent.

J. F. Coakley, District Attorney, R. Robert Hunter, Chief Assistant District Attorney, and Ben H. Zuppan, Deputy District Attorney, for Plaintiff and Appellant.

Bertram Edises, for Defendant and Respondent.

SIMS, J.—This case comes before this court for hearing and decision pursuant to an order granting transfer following certification by the appellate department of the superior court that such transfer appears necessary to settle important questions of law. (Cal. Const., art. VI, § 4e; Code Civ. Proc., § 988t; and Cal. Rules of Court, rules 61-65.) The question presented is stated to be "whether Section 903 of the Welfare and Institutions Code[1] is unconstitutional in that it denies defendant-respondent herein equal protection of the law in violation of the Fourteenth Amendment of the United States Constitution and Article I, Sections 11 and 21 of the California Constitution."

On May 4, 1965, plaintiff and appellant County of Alameda filed its complaint in the municipal court against defendant and respondent, as the father of John Espinoza, Jr., a minor, to recover the cost of the care, support and maintenance of

---

[1]Section 903 of the Welfare and Institutions Code provides: "The father, mother, spouse, or other person liable for the support of a minor person, the estates of such persons, and the estate of such minor person, shall be liable for the cost of his care, support, and maintenance in any county institution in which he is placed, detained, or committed pursuant to the order of the juvenile court, or for the cost to the county in which the juvenile court making the order is located, of his care, support, and maintenance in any other place in which he is placed, detained, or committed pursuant to the order of the juvenile court. The liability of such persons (in this article called relatives) and estates shall be a joint and several liability."

All further references are to sections of the Welfare and Institutions Code unless otherwise noted.

said minor. From an amended complaint filed June 30, 1965, it appears: that pursuant to an order of the juvenile court the minor was ordered detained on January 13, 1964, in juvenile hall, a county institution, and thereafter committed to Alameda County Boys' Camp; that he had been receiving care, support and maintenance in those institutions from January 13, 1964, to and including May 2, 1965; that the cost thereof was $1,208 ;[2] and that no part thereof had been paid.

The father demurred on the grounds indicated by the certified question. The trial judge sustained the demurrer without leave to amend upon the authority of *Department of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720], (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321], and *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247 [28 Cal.Rptr. 718, 379 P.2d 22]. Judgment was entered accordingly and upon appeal by the county was affirmed by the appellate department of the superior court without opinion. The county petitioned for certification, and the certification and order leading to consideration by this court ensued.

There is no Jovian shaft from Olympus which illuminates an express constitutional formula which embraces this case. It is necessary to examine the existing precedents, the reasoning and policies upon which they are based, and the history of the legislation in question in order to determine the propriety of the decision which represents the uniform opinion of four learned judicial minds. This examination indicates that there is no compelling precedent which brands the enforcement of the parental duty to support as unconstitutional in circumstances short of detention in jail or in a mental institution in connection with the prosecution of criminal proceedings which would lead to the child's conviction and sentence for a crime. Although the reasoning and policies advanced to preclude statutory imposition of liability for support upon a relative not otherwise responsible therefore, or upon a parent under

---

[2]Although the amended complaint alleges that the sum due is ''as established pursuant to Welfare & Institutions Code, Section 903,'' there is no provision in that section for ''establishing'' an amount. Compare section 904 which provides for determining the cost of care in a county institution, and section 905 which provides for establishing the amount that a responsible relative is financially able to pay. The county has asserted before the appellate department of the superior court and before this court that the defendant has ''the ability to pay said sum as determined under section 905 of the Welfare and Institutions Code,'' but the allegations of the amended complaint merely negate a reduction, cancellation or remission of the sum otherwise claimed.

the circumstances outlined above are broad enough to embrace the situation presented herein, they should yield to countervailing policy predicated upon statutory history and the general philosophy of the Juvenile Court Law.

Reference to the Juvenile Court Law reflects a varying spectrum of interference in the parent-child relationship which is dependent upon the particular facts giving the court jurisdiction. (Cf. §§ 600, 725, subd. (c) ; 726, subds. (a) and (c) ; and 727 with §§ 601; 725, subds. (a) and (b) ; 726, subds. (a), (b) and (c) ; and 730; and with §§ 602, 725, subds. (a) and (b) ; 726, subds. (a), (b) and (c) and 731.) The disposition, as qualified by the foregoing categorization, may vary from informal probation with the consent of the parent or guardian of a minor (§ 654), through formal probation (§§ 725, subd. (a) and 726), to removal from custody (§ 726, subds. (a), (b), and (c)) and commitment to a person, to an association, society or corporation, to a suitable family home or private institution or to a public agency (§ 727) ; to a county juvenile home, ranch, camp or forestry camp (§ 730) ; or to the Youth Authority (§ 731).

In the instant case the father has requested that judicial notice be taken of the proceedings leading to the commitment of his son and the county has conceded: that the minor was born September 15, 1948, and was made a ward of the court prior to December 6, 1963, on which date a supplemental petition (see § 777) was filed charging him with violation of section 217 of the Penal Code; that the allegations of that petition were found to be true and he was found to be a person described by section 602; that his welfare required that his custody be taken from his parent; and that he was committed to the Alameda County Boys' Camp. (See § 730.) [3]

■ At one end of the spectrum section 196 of the Civil Code makes it clear that the responsibility for the support of the minor is with the parent so long as he is entitled to and has actual custody of the minor. ■ At the other end, it is clear that if criminal proceedings against a minor over the age

[3]The father refers to a further order, entered on a later supplemental petition filed April 5, 1965, wherein it was found that the minor violated section 10851 of the Vehicle Code, the prior order was revoked and he was committed to the Youth Authority (see §§ 731 and 1769). The question of reimbursement for the amounts payable by the county to the Youth Authority (see §§ 903 and 912 and cf. *Svoboda* v. *Superior Court* (1923) 190 Cal. 727, 731 [214 P. 440] with *Department of Mental Hygiene* v. *McGilvery* (1958) 50 Cal.2d 742, 757-758 [329 P.2d 689] and *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247, 254 [28 Cal.Rptr. 718, 379 P.2d 22]) is not at issue in these proceedings.

of 18 years are not certified to the juvenile court (cf. § 604, subd. (a) with § 604, subd. (b)) there is no right to reimbursement for the expenses of the support of such minor while he is detained in connection with those proceedings, even though it be as a mental patient pursuant to the provisions of section 1026 or sections 1368 et seq. of the Penal Code. The provisions of section 6650 of the Welfare and Institutions Code which purported to give a right to reimbursement under such circumstances were held to be unconstitutional. (*Department of Mental Hygiene* v. *Hawley, supra,* 59 Cal.2d 247, 256;[4] and cf. Welfare and Institutions Code section 703 which purports to give a right to reimbursement for costs of observation at a state mental institution of a minor found to be subject to the Juvenile Court Act.) Presumably the same rule would apply where the juvenile court, pursuant to the provisions of section 707, directs that criminal prosecution be commenced or resumed because a minor of requisite age is not a fit or proper subject for juvenile court proceedings.

The provisions of the Juvenile Court Law as it has existed throughout the years have consistently provided for reimbursement or payment by the parents for the cost of the care, support and maintenance of the minor, at least to the extent they were able to do so.[5] The provisions now found in sections 900-914 are substantially the same as those found in sections 860-871 (Stats. 1937, ch. 369, §§ 860-870, pp. 1048-1051 as amended through Stats. 1959, ch. 2145, pp. 5112-5114) prior to the 1961 revision. (Stats. 1961, ch. 1616, §§ 900-914, pp. 3499-3503.) These provisions were approved by the Governor's Special Study Commission on Juvenile Justice with but minor

[4]The facts in *Hawley* reflect that the son was born in August 1936 and was committed pursuant to the provisions of sections 1368 et seq. of the Penal Code in February 1956 during his 19th year. Recovery was sought from the father for the period from January 1956 (apparently custodial care was furnished in connection with precommitment examination) through October 1960, which included approximately 20 months of minority. (59 Cal.2d at p. 249.)

[5]See Stats. 1889, ch. 108, p. 111, § 24 at p. 117 and § 29 at p. 119; Stats. 1903, ch. 43, p. 44, § 8 at p. 47 (provision ''by voluntary contribution or otherwise''); Stats. 1905, ch. 610, p. 806, § 17 at pp. 812, 813 (adding to Act of 1903 a new section 16 which incorporates provision of former section 8, and adds authorization to order that the expense of maintenance be paid by the parents); Stats. 1907, ch. 427, p. 777 (amending section 16 of Act of 1903 as amended 1905); Stats. 1909, ch. 133, p. 213, § 21 at p. 224; Stats. 1911, ch. 369, p. 658, § 21 at p. 671; Stats. 1913, ch. 673, p. 1285, § 23 at p. 1301; Stats. 1915, ch. 631, p. 1225, § 11 at p. 1234; Stats. 1937, ch. 369, p. 1005 (Welf. & Inst. Code) §§ 863-868 at pp. 1049, 1050; Stats. 1959, ch. 2145, p. 5112, §§ 1 to 8 at pp. 5112-5114 (revising code §§ 863-868).

revisions. (See the commission's "Recommendations for Changes in California's Juvenile Court Law" (Nov. 1960) pp. 90-94.) ▮▮▮ In 1965 after the pronouncements in *Hawley* and *Kirchner* the Legislature added section 903.1 to the code to provide that the same persons as named in section 903 would be liable for the cost of legal services rendered to a minor by the public defender or a private attorney appointed by the juvenile court. Sections 904 to 908 were revised accordingly to include reference to "cost of legal services" along with reference to "care, support and maintenance." (Stats. 1965, ch. 2006, pp. 4535-4537.) By the addition to and republication of the provisions regarding parental liability the Legislature demonstrated that it adhered to the propriety of the system of reimbursement theretofore established despite the questions posed by *Hawley* and *Kirchner*.

Under the prior law (Stats. 1915, ch. 631, § 11, p. 1234 as amended Stats. 1921, ch. 512, § 3, p. 803) it was held "that the court may direct the parent, or parents, of such ward, financially able to do so, to reimburse the county, regardless of whether or not he, she, or they may have been deprived of the custody of the child in any previous divorce proceeding . . . [and] that the respondent did not act in excess of its jurisdiction in requiring the petitioner to reimburse the county of Alameda for the expense of the support and maintenance of his minor child at the Preston School of Industry." (*Svoboda v. Superior Court* (1923) 190 Cal. 727, 731 [214 P. 440].) A similar result was reached for the cost of foster home placement for a minor who was made a ward because she was in danger of leading an immoral life. The decision, written by Peters, P. J., examined the provisions of sections 860-864 as originally incorporated in the code (Stats. 1937, ch. 369, §§ 860-864, pp. 1048, 1049) and amended in 1940 (Stats. 1939, ch. 1099, § 2, p. 3028); and rejects the contention that the mother had no legal obligation to support her child because she had been deprived of her custody by both a divorce decree and the order of the juvenile court. (*In re Carboni* (1941) 46 Cal.App.2d 605, 609-612 [116 P.2d 453].) The writer of the opinion observed: "This contention, if approved, would mean that a mother who had been deprived of the custody of her child because of her wrongful conduct, could not be compelled to assist the county in supporting the child, even though able to pay for such support." (46 Cal.App.2d at p. 609.)

It is asserted that the rationale of *Hawley* renders the foregoing cases obsolete because they sanction an unconstitutional practice. This view is supported by the following language:

"The enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions—subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should (subject to reasonable exceptions against the inmate or his estate) be borne by the state. . . .

"The mere fact that innocent persons are relatives of an accused or convicted person does not deprive them of *their* fundamental rights or constitute a lawful basis for a statute or judgment whereby their property may be taken to pay the costs of prosecuting, detaining, or otherwise treating the accused. No decision or authority to the contrary has been cited or discovered." (59 Cal.2d at pp. 255, 256.)

The same thought is expressed in *Kirchner* as follows: "Whether the commitment is incidental to an alleged violation of a penal statute, as in *Hawley*, or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (60 Cal.2d at p. 720.)

This court recently reviewed the foregoing pronouncements in *In re Dudley* (1966) 239 Cal.App.2d 401 [48 Cal.Rptr. 790] (hearing by S. Ct. denied March 14, 1966). Therein the conflict in policy was set forth as follows: "If *Kirchner* stands for the proposition that when the state, in the exercise of its promotion of the general welfare, commits a person either for the protection of society or for his protection or rehabilitation, or any combination thereof, it cannot thereafter seek reimbursement except from such person or his estate, that case then is determinative of the matter in issue. On the other hand, if *Kirchner* is limited to its facts and does not preclude the state from seeking reimbursement from those otherwise legally responsible for the care, support and maintenance of the person treated, inquiry must be directed to a determination of whether or not respondent is responsible for the support of her adult daughter; and, if so, whether the state has properly provided for the enforcement of any obligation arising from that responsibility." (239 Cal.App.2d at p. 407; fns. omitted.)